Margaret Sczuck, Appellee, v. Chicago Railways Company et al., operating as Chicago Surface Lines, Appellants.

Gen. No. 27,681.

1. CARRIERS—*when due care in operating street car not shown as matter of law.* Lack of negligence in operating a street car over a "crossover" switch as to a passenger boarding such car is not shown as a matter of law by evidence that the car was standing at the end of the line and that a number of passengers had boarded it and were standing on the rear platform waiting to pay their fares, that plaintiff had stepped onto the steps but before she could step onto the platform the car started, at a signal from the "starter," to back from the track on which it had been standing over a "crossover" switch onto another track to continue its regular course, that it backed at an excessive speed and as it struck the switch gave a hard lurch and broke plaintiff's grip on the upright bar on the platform and threw her from the car, causing the injuries complained of, although there is evidence that the speed of the car was not excessive, that it was being operated in the usual way and that the jerk or lurch as it struck the switch was not unusual and that plaintiff did not have hold of the upright bar in question.

2. HARMLESS AND PREJUDICIAL ERROR—*invited error in instruction not prejudicial.* A carrier of passengers is not harmed by an instruction defining the degree of care which a passenger is bound to exercise in boarding a car which is about to start, from which instruction an essential qualification has been omitted, where such qualification was included in the instruction as offered by plaintiff and was omitted on objection by the carrier, especially where such element is contained in instructions offered by the carrier.

3. CARRIERS—*correctness of instruction on duty of carriers to passengers.* An instruction that it is the duty of a common carrier of passengers to do all "that human care, diligence and foresight could reasonably do in view of the character and mode of conveyance adopted and consistently with the practical operation of its road to carry its passengers safely," that the carrier was not an insurer of the safety of its passengers but in legal contemplation did undertake to exercise the "highest degree of practical care to secure the safety of its passengers and is responsible for the slightest negligence resulting in injury" to its passengers, is not objectionable as being extreme and containing extravagant language.

4. DAMAGES—*injury to ability to perform ordinary labor as ele-*

*ment of damage to housewife from personal injury.* An instruction in a personal injuries action is not erroneous for allowing the jury, in assessing damages, to consider the inability of the plaintiff to perform ordinary labor as a proximate result of her injuries where the evidence shows that plaintiff is a housewife and that before her injury she performed the ordinary duties of a housewife, including scrubbing, washing, and sometimes calcimining, and other usual household duties.

5. DAMAGES—*when doctor's bill properly allowable as damages for personal injuries.* An instruction in a personal injuries action is not erroneous in authorizing a recovery for the amount of moneys necessarily expended or to become liable for doctor's bills, where it appears that none had been paid, although the attending doctor had charged a substantial sum for his services, where the evidence is sufficient to warrant the inclusion of such item, which is not shown to be excessive, and although it appears that the plaintiff is a married woman and her husband is liable under the statute for the bill and has not relinquished his claim to reimbursement by the wife in case he paid the bill.

6. DAMAGES—*when damages for personal injuries not excessive as matter of law.* An award of $5,500 as damages for personal injuries sustained by a housewife when she was thrown from a street car by the negligent manner in which it was operated is not excessive where the evidence shows that prior to the accident she was in good health and performed all her household duties, and was not crippled or deformed and had never suffered any serious or disabling illness, and that she suffered numerous cuts and bruises, including symptoms of concussion of the brain, in the fall from the car and that thereafter she was unable to perform any household duties whatever for a period of months and nothing but dusting up to the time of trial and that as the result of her injuries she was almost completely disabled and had suffered much pain, and where there is no direct evidence that her condition did not result from the injuries.

Appeal by defendants from the Superior Court of Cook county; the Hon. OSCAR HEBEL, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1922. Affirmed. Opinion filed May 9, 1923.

CHARLES LEROY BROWN, for appellants; JOHN R. GUILLIAMS, FRANKLIN B. HUSSEY and FRANK L. KRIETE, of counsel.

Sczuck v. Chicago Railways Co., 229 Ill. App. 325.

ALLEGRETTI, SHEA & GANNON, for appellee; JOHN G. RIORDAN and JOHN F. SHEA, of counsel.

MR. JUSTICE O'CONNOR delivered the opinion of the court.

Plaintiff brought suit against the defendants to recover damages claimed to have been sustained by her in falling off one of defendants' street cars as a result of the negligence of defendants' servants in the operation of the car. There was a verdict and judgment in her favor for $5,500, to reverse which this appeal is prosecuted.

The evidence tends to show that the defendants operate a double street car line in Adams street, an east and west street in Chicago; that the eastern terminus is in Adams street just west of State street, a north and south street; that on December 22, 1919, plaintiff, who lived in the southwest section of the city, boarded one of defendants' cars to come downtown to do some shopping; that the car stopped in Adams street just west of State street and plaintiff went into The Fair, which is located on the north side of Adams street between State and Dearborn streets, where she did her shopping; that a few minutes before five o'clock she came out of the store to go home; that one of defendants' cars was standing on the south or eastbound track at the end of the line and she proceeded to board it; that as she was in the act of doing so, she testified, the car started before she got on the platform; that the car proceeded west 50 or 60 feet and then started to switch over to the north or westbound track, and as the car was taking the switch the rear end of it swung to the south and the jar threw her backwards onto the pavement and she was injured.

The defendants contend (1) that there is no liability on their part and the court should have directed a verdict in their favor; (2) that the court erred in ruling

on the instructions, and (3) that the damages are grossly excessive.

1. The evidence as to the occurrence is to the effect that it was a drizzly evening and just about dark; that twenty-five or thirty people boarded the car just ahead of the plaintiff; that a number of these were still on the back platform as she proceeded to get on the car; that one passenger got on the car after she started to do so. Plaintiff testified that she had ridden over this line a number of times before and knew that the street car in proceeding west on the south or eastbound track switched over to the north or westbound track; that the car was of the pay as you enter type; that she had a one-pound box and a. two-pound box of candy in her left hand and a hand bag on her arm; that she had a small purse in which she kept her money in her right hand; that standing in the street near the rear entrance where the passengers were boarding the car was a street car employee in uniform with the word "starter" on his cap; that he told her to get on and touched her arm; that she then put her right foot on the step, took hold of the upright bar with her right hand and as she was stepping up with her left foot the starter told the conductor to "pull out"; that the car at once started and the jar unbalanced her; that as she got her left foot on the lower step, the car went faster and as it took the switch the rear end swung to the south from under her. Her hold was broken and she fell backwards on the pavement.

Julius R. Nielsen, called by the plaintiff, testified that he was just behind the plaintiff as she was starting to board the car; that he got on the car step just west of the plaintiff and at the place where passengers alight from the car; that it was about 4:30 in the afternoon and was dark; that plaintiff was standing on the platform of the car; that he paid no particular attention to see whether she was on the platform or

Sczuck v. Chicago Railways Co., 229 Ill. App. 325.

on the step at the time; that the car started with a kind of jerk; that the supervisor or starter of the company stood near the front of the street car and motioned the motorman to come ahead and that the car then started; that he did not see anyone standing near the rear platform; that plaintiff had hold of the upright bar and that as the car went over the switch it lurched a hard lurch and plaintiff fell off backwards in the street. He further testified that at the time the plaintiff fell the car had moved 60 or 70 feet; that it was going 9 or 10 miles per hour when she fell; that after plaintiff fell the car was stopped and he went back with the conductor and helped put her in the same street car; that she was about 20 feet behind the car when it stopped; that there was a kind of drizzly rain at the time and the street was slushy and wet.

The defendants' version was related by the conductor, starter and motorman. The conductor, Russ, testified that at the time plaintiff started to board the car the west end of the car was about 50 feet east of the switch; that a number of passengers boarded the car ahead of plaintiff; that he was busy collecting fares and issuing transfers; that he was standing in his customary place facing east and inside an iron railing or bar; that while the car was standing still plaintiff boarded it and was upon the platform; that there were five or six other passengers standing on the platform just ahead of her; that she was about 2 feet south of the north edge of the platform and east of the horizontal rod; that no one was on the lower step when the car started; that the car started slowly and after it had traveled 50 or 60 feet it began to take the switch and the rear platform swung to the south and that he noticed plaintiff going off backwards; that nobody else was thrown from the car or jostled around; that she had several packages in one arm and that just before she fell she had her money ready to pay her fare; that she did not have hold of the upright stanchion or bar of the car; that as she fell he

tried to grab her but was unable to do so; that he then gave the motorman the signal to stop the car at once, which was done; that he got off the car and went to plaintiff, who was lying about 20 feet east of the rear end of the car, and that together with the supervisor and another man they put her on the back platform of the car; that when the car was going over the switch it was going about 4 or 5 miles per hour; that there was no unusual swing or jerk of the car at that time; that he endeavored to get the names of other passengers but they stated they did not see how the accident occurred.

Reidy, the starter, testified that he had worked for the street car company continuously for over 46 years; that at the time in question he was acting as starter or supervisor of the cars at the east terminus of the Adams street line; that he was in uniform and no other starter or supervisor was there; that before the passengers boarded the car it was standing about 40 feet east of the switch; that the witness was standing north of the car and near the front platform; that he was facing east watching the passengers getting on; that the plaintiff was the second last person to board the car; that he saw plaintiff get on the platform and go inside where he could not see her; that he said "All aboard" and then motioned the motorman to start the car, which was done; that at the time the car started no one was boarding it; that when the front trucks struck the switch the car swayed some to the south, and at the time the rear platform was "right opposite" him—about near enough for him to grab her as she fell—he saw her fall backwards with "one foot down on the lower step;" that she fell backwards in the street and a passenger picked her up and put her on the car; that as the car was going over the switch he was walking backwards and keeping up with it; that it was going less than 3 miles an hour.

The motorman testified that when the car was being loaded it was 45 or 50 feet east of the switch; that at

that time he was standing at his accustomed place in the front end of the car and the starter stood just north of him in the street; that passengers were boarding the car at the rear or east end and from the north side; that the starter, by motion of his hand, directed him when to start the car; that the car started very slowly, he having applied one point of power, and that he afterwards fed it up to two points, and that before he hit the switch he turned off the power and applied the air; that the highest speed he attained was 4 or 5 miles an hour; that he was going about 3 or 4 miles an hour when the car took the switch; that when he got the emergency bell he stopped the car, put his head out the door, looked back and saw the starter and other men assisting plaintiff back on the car. This is the substance of all the evidence as to how the accident occurred.

Two other witnesses testified for the defendants as experts in the operation of street cars, and their testimony was to the effect that the car in question could not have been traveling at the rate of 9 or 10 miles an hour when it took the switch, but that the greatest speed that could be attained under the circumstances was not to exceed 3 or 4 miles an hour; that a street car such as the one in question in the short distance to the switch could not attain a speed of 10 miles per hour.

The defendants contend that the overwhelming weight of the evidence shows that plaintiff was upon the platform before the car was started; that this is shown by the evidence of the conductor, the starter, and plaintiff's witness Nielsen, and that the only evidence to the contrary is that of the plaintiff; that, inasmuch as the plaintiff was upon the platform of the car before it started and since there was no unusual movement of the car but it was, in fact, operated in the normal way, there is no liability on the part of defendants for plaintiff's injuries. They further con-

tend that the jerk or lurch is an inevitable incident in the operation of the car over a crossover switch. Of course, there is always more or less necessary jerk or movement of a street car in starting and passing over a switch such as the one in question which can never be obviated, and if a person is injured as a result of such operation, no recovery can be had. We think we would not be warranted in holding that plaintiff could not recover even if she were upon the platform, as defendants contend, either as a matter of law or as a matter of fact, because the evidence tends to show that plaintiff had hold of the upright rod with her right hand and that the movement of the car was such as to break her hold and cause her to fall as the car was passing over the switch or crossover. The jury were specifically instructed at the request of the defendants that if they believed from the evidence that plaintiff was standing upon the back platform of the car, lost her balance and fell from the car at the time the rear end of it moved towards the south, and that this was brought about through no negligence on the part of the defendants but solely on account of the usual, natural and ordinary turning of the car, then plaintiff could not recover. The evidence tended to show that the car started with an unusual jerk or movement and that it passed over the switch at a rate of speed which the jury might well have believed was negligence, on the part of the men in charge of the car. In any event, as to the exact speed of the car as it took the switch, in miles per hour, it cannot be said that that will determine the question of negligence. In other words, we cannot know, as a matter of law, whether such a car as the one involved here, entering a switch at 3 or 4 miles per hour, will or will not cause such a sudden sideward movement of the platform as to amount to negligence, when considered in connection with a passenger who has just entered onto the platform and is standing at or near its edge waiting to pay her fare, a number of other passengers having

immediately preceded her. That question was one for the jury, under all the evidence. In these circumstances the verdict of the jury should not be disturbed. Moreover, the jury might well believe that the car started when plaintiff had but one foot on the lower step and before she got upon the platform, causing her to lose her balance and subsequently fall. If the car started up while plaintiff was in the act of boarding it, as she testified, then we think it clear that the jury would be warranted in finding the defendants were negligent. Cases somewhat similar in which the defendant was held liable are *Ruch v. Aurora, E. & C. R. Co.*, 150 Ill. App. 329; *Lietz v. Chicago City Ry. Co.*, 162 Ill. App. 328. See also, *Heineke v. Chicago Rys. Co.*, 279 Ill. 210, and *Chicago City Ry. Co. v. Mc-Caughna*, 216 Ill. 202.

2. Complaint is also made that the court erred in giving at the request of the plaintiff instructions numbered 1, 3 and 4. Instruction 1 told the jury that when it was stated in the instructions that plaintiff was required to exercise ordinary care for her own safety it was meant that she was required to exercise that "degree of care which an ordinarily prudent person would before and at the time of the accident have exercised for his or her own safety." It is contended that this instruction ignores the element "under the same or similar circumstances." The record discloses that this element was included in the instruction as submitted by plaintiff but that it was eliminated upon objection by defendants. In these circumstances the defendants ought not now be heard to complain that the instruction was wrong. Furthermore, the court at the request of defendants gave an instruction which defined ordinary care to be "such care as a person of ordinary prudence and caution, acting prudently, would exercise under the same or like circumstances," and that plaintiff must prove that she was in the exercise of ordinary care by the greater weight of the

evidence.   This certainly cured any error in instruction 1.

Instruction 3 told the jury that it was the duty of a common carrier to do all "that human care, diligence and foresight could reasonably do in view of the character and mode of conveyance adopted and consistently with the practical operation of its road to carry its passengers safely" and that defendants were not insurers of the absolute safety of their passengers, but that in legal contemplation they did undertake to exercise the "highest degree of practical care to secure the safety of its passengers and is responsible for the slightest negligence resulting in injury to its passengers," etc.   It is contended that the instruction is extreme and the language extravagant.   Substantially the same objection was made to an instruction similar to this in the case of *Chicago City Ry. Co. v. Shaw*, 220 Ill. 532, where it was held that the objection was untenable.   The court there said: "The words in the instruction that are complained of are 'slightest negligence.'   Practically the same instruction in the same words complained of was before this court in the case of *Chicago & A. R. Co. v. Byrum*, 153 Ill. 131, and cases cited on p. 135, and the giving of the same was approved.   We do not feel at liberty to overrule what was said in that case and are of the opinion that the instruction stated the law correctly."   We think the instruction is not subject to the criticism made.

Instruction 4 was on the question of the amount of damages, and the jury were there told that they should take into consideration all the evidence pertaining to plaintiff's injuries which were the proximate result of the accident, and among other things they should consider her inability to perform ordinary labor, if any, on account of the injuries.   It is contended that the jury were not warranted in allowing any damages for plaintiff's inability to perform ordinary labor; that plaintiff was not a common laborer but a housewife and that there was no evidence that she ever per-

formed manual labor. The evidence tended to show that prior to the accident plaintiff performed the ordinary duties of a housewife, scrubbing, washing and sometimes calcimining, and other usual household duties. We think the evidence was such that the jury clearly understood what they might take into consideration in fixing the amount of the plaintiff's damages and that the objection is not well taken. A further objection to this instruction is that it authorizes a recovery of "all moneys necessarily expended or become liable for doctors' bills" and that Dr. Smith testified that he had charged $484; that there was no evidence that the bill was paid, but plaintiff testified that she had not paid the doctor anything. It is argued that plaintiff being a married woman living with her husband, he was, under the statute, liable for this bill and that it was improper to authorize a recovery for this element of damages unless plaintiff had paid the bill or unless her husband had relinquished his claim to his wife for reimbursement in case he had paid the bill. Of course, there is no evidence that the charge made by the doctor for 154 visits was excessive. We think the evidence was sufficient to warrant the inclusion of this item and that the instruction was not erroneous. *West Chicago St. R. Co. v. Carr,* 170 Ill. 478.

3. It is insisted that the damages are grossly excessive, and this on the theory that although plaintiff after the accident was incapacitated from performing her household duties up to the time of the trial, yet the evidence shows that her inability to do so was not occasioned by the injuries she received but on account of physical disabilities that were in no way caused by the accident. The evidence tends to show that at the time of the accident plaintiff was about 43 years of age; that she was married and lived with her husband and children; that she had borne five children, three of whom were living; that she weighed about 160 pounds (she weighed 190 pounds at the time of the trial); that prior to the accident she was in good

health and did her household work; that she baked, washed the clothes, did the scrubbing, cooking, and at times calcimined the house where she lived; that she had never been in an accident before and had never been crippled or deformed in any way; that there was nothing wrong with her after the birth of her children; that she had never been ill except on two or three occasions when she had the grippe, which does not seem to have been at all severe, and from which she entirely recovered; that the last time she menstruated was about two months prior to the accident. A number of witnesses testified that she always appeared well' and healthy and had done all of her household work until the accident, and that she had done nothing but dusting since. Her family physician, Dr. Smith, testified that he had been her family physician for 15 or 20 years; that he delivered her of two of her children; that there were no after effects; that he treated her occasionally for grippe, three or four times, in different years; that at the time of the accident "she was a woman of about the age of change of life"; that he made an examination and that she did not have rheumatism; that on the evening of the accident he was called to plaintiff's home where he made an examination and found bruises on her back, right shoulder and right leg; that there were two large cuts on the back of her head on each side of the occipital bone, one down to the bone and the other a flesh wound; that they did not require stitching and healed readily; that there were no bones broken; that after the accident he called on the plaintiff 154 times, the last time but a few days prior to the trial; that the bruises which he found on her body were on her spine, embracing about the first six of the dorsal vertebræ; that the humerus between the elbow and the shoulder, and the right hip and the knee and the calf of the right leg and the right ear were bruised; that he found symptoms of concussion of the brain. The evidence also shows that when plaintiff was assisted to the car

Sczuck v. Chicago Railways Co., 229 Ill. App. 325.

after she was injured she seemed to be somewhat dazed, and after the car had proceeded across the river she complained so that it was necessary to remove her from the car and she was taken home by a gentleman passing in an automobile. Plaintiff testified that for two months after the accident she did nothing but sit in a big armchair propped up with pillows; that she could not lie on her back or right side; that she had pains for two months in the small of her back, her elbow and right arm; that she suffered pain; that there was a running from her right ear; that she was unable to use her right arm for two months after the accident; that the joints of her arm and fingers were stiff; that her head bothered her so that she had to wear glasses; that her right leg was still stiff at the ankle and in the hip; that she walked with a limp; that it pained her all the time; that she was unable to raise her right arm further than about level with her shoulder; that since the accident she had not been able to comb her hair or dress herself; that she was unable to bend over or lace her shoes. She was corroborated by members of her family and some neighbors. Dr. Smith and Dr. Amerson testified in answer to a hypothetical question that in their opinion plaintiff's troubles might be attributed to the injuries which were received from the fall. On the other hand, Drs. Small and Krohn testified in reply to hypothetical questions that in their opinion plaintiff's condition, as testified to, could not be attributed to the injuries she received from falling off the car. The evidence further showed that plaintiff had most of her teeth removed prior to the accident, and the defendants contend that the evidence further shows that plaintiff was not always healthy before she was injured, but on the contrary shows she had myocarditis, diseased teeth and grippe. Dr. Smith testified by deposition that plaintiff had a fatty heart; that it might be myocarditis, but whether he found this condition before or after the accident is not clear. But even if such condition ex-

isted before the accident it does not appear that her health was noticeably affected as a result of it. Upon a consideration of the record, we are unable to say that the damages are excessive. *DeFillippi v. Spring Valley Coal Co.*, 202 Ill. App. 61; *Delohery v. Quinlan*, 210 Ill. App. 321; *Girdzus v. Van Etten*, 211 Ill. App. 533; *Posch v. Chicago Rys. Co.*, 221 Ill. App. 241.

The judgment of the superior court of Cook county is affirmed.

*Affirmed.*

THOMSON, P. J., and TAYLOR, J., concur.